**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RDP TECHNOLOGIES, INC.,**<br><br>    **Plaintiff,**<br><br>          v.<br><br>**CAMBI AS,**<br><br>    **Defendant.** | **Civil Action No.  10-1951 (JDB)** |

<u>**MEMORANDUM OPINION**</u>

Plaintiff RDP Technologies, Inc. ("RDP") brings this action against Cambi AS ("Cambi") alleging breach of contract and other common law claims stemming from Cambi's alleged refusal to pay RDP the five percent commission that it was owed under the terms of the parties' agreement.  Specifically, RDP maintains that it entered into a contract with Cambi, under which RDP would convince the District of Columbia Water and Sewer Authority ("DCWASA") to use Cambi's patented thermal hydrolysis process in an upgrade to one of its water treatment plants, and in return, Cambi would pay RDP five percent of the proceeds that it received from DCWASA.  According to RDP, it succeeded in persuading DCWASA to use Cambi's thermal hydrolysis process, but Cambi has refused to pay RDP its share of the proceeds.  Currently before the Court is Cambi's motion to dismiss for insufficient service of process and for failure to present a ripe claim, and Cambi's motion to compel arbitration.  For the reasons explained below, the Court will deny the motion to dismiss and deny the motion to compel arbitration.

## BACKGROUND

RDP is a corporation that designs, builds, and installs equipment for water treatment plants. Compl. ¶ 19 [Docket Entry 1]. Cambi is a Norwegian corporation that owns a patented thermal hydrolysis process used to convert wastewater into "class A biosolids." Id. ¶¶ 2, 9-10. Because class A biosolids have commercial value as fertilizer, water treatment plants often seek to convert the wastewater that they produce into these biosolids. See id. ¶¶ 11-13, 16.

The District of Columbia Water and Sewer Authority ("DCWASA") operates the Blue Plains plant, which provides water and wastewater treatment to the District. Id. ¶¶ 3-4. Cambi supposedly hired RDP as its United States agent to persuade DCWASA to install Cambi's thermal hydrolysis process as part of an upgrade to the Blue Plains treatment plant. Id. ¶¶ 20-23. In exchange for RDP's work, Cambi allegedly agreed to pay RDP a five percent commission on any payment that it ultimately received from DCWASA. Id. ¶ 41. RDP contends that after approximately seven years of effort, it succeeded in convincing DCWASA to use Cambi's technology as part of its upgrade of the Blue Plains facility. Id. ¶¶ 25-26, 62.

According to RDP, DCWASA intends to spend approximately $600 million to upgrade the plant, $60 million of which will be spent purchasing the equipment and technology needed to use Cambi's thermal hydrolysis process. Id. ¶¶ 27-28. Although DCWASA and Cambi have not yet finalized their contract, RDP alleges that DCWASA has already made some payments to Cambi. Id. ¶ 29. RDP further alleges that because of its success in convincing DCWASA to use Cambi's thermal hydrolysis process, and pursuant to the term of its agreement with Cambi, Cambi owes it an amount exceeding $75,000, exclusive of interest and costs. Id. ¶ 5.

In December 2008, Cambi e-mailed RDP a proposed agency agreement to memorialize

the terms of their arrangement.  Id. ¶ 40.  The agreement contained a forum selection and arbitration clause, stating that "[a]ny dispute, controversy or claim arising out of or in connection with this agreement, or the breach or invalidity thereof, shall be settled by arbitration" in accordance with the Norwegian Arbitration Act.  See Def.'s Mot. to Dismiss or to Compel Arbitration ("Def.'s Mot.") [Docket Entry 7], Ex. A., Agency Agreement between Cambi and RDP ("Agency Agreement"), art. 11.

In May 2009, RDP president Richard Christy discussed the proposed agency agreement with Harald Kleiven, Cambi's business development manager, at a conference in Oregon.  Id. ¶ 44.  Christy raised several questions and concerns about the proposed agency agreement, and Kleiven allegedly assured Christy that the issues raised were open to discussion.  Id. ¶¶ 45-46.  Shortly thereafter, Christy signed the proposed agency agreement without making any modifications and returned it to Cambi.  Id. ¶ 47.  Cambi declined to countersign the agreement, and instead allegedly contacted Paul Christy, RDP's CFO and Richard Christy's brother, to ask how Cambi should proceed in its future dealings with RDP.  Id. ¶¶ 51-52.  Apparently, Richard and Paul Christy were, at the time, entangled in several disputes that eventually led to Paul Christy's resignation from RDP.  Id. ¶¶ 54, 56.  According to RDP, Paul Christy had even begun negotiating with Cambi in an attempt to replace RDP as Cambi's sole agent for the DCWASA deal.  Id. ¶ 55.  On September 23, 2009, following Paul Christy's departure from RDP, Cambi officially notified RDP that it was withdrawing the proposed agency agreement.  Id. ¶¶ 57, 58.

RDP now claims that Cambi owes it five percent of the funds that DCWASA has paid and will continue to pay Cambi for the use of Cambi's thermal hydrolysis process.  Id. ¶¶ 63-64.  RDP further alleges that it has demanded payment from Cambi, but that Cambi has refused to

make any such payment.  Id.  On November 15, 2010, RDP brought this action against Cambi,

asserting common law claims for unjust enrichment (Count I), quantum meruit (Count II),

breach of oral contract (Count III), conspiracy (Count IV), and breach of express contract (Count

VI).  See id. ¶¶ 67-97, 101-104.  RDP also seeks a declaratory judgment that Cambi owes it 5%

of all monies received from DCWASA (Count V).  See id. ¶¶ 98-100.  Three days after it filed

suit, RDP attempted to effect service of process on Cambi by leaving the summons and

complaint with the wife of Keith Hamilton, whom RDP allegedly believed to be an authorized

agent of Cambi's.  See Aff. Service [Docket Entry 4].  Cambi, however, contends that Hamilton

is merely a consultant who "is not an officer or agent of Cambi AS" and "has no authority to

bind the company or to accept service on its behalf."  See Def.'s Mot at 4.

On December 9, 2010, Cambi filed this motion to dismiss, in part on the basis of

insufficient service of process.  See Def.'s Mot at 3-5.  RDP responded by attempting to effect

service of process upon Cambi pursuant to the Hague Convention on the Service Abroad of

Judicial and Extrajudicial Documents ("Hague Convention").  Specifically, on January 18, 2011,

RDP filed an affidavit stating that it had mailed a copy of the summons and complaint to the

Norwegian Central Authority pursuant to the Hague Convention and that the documents had

been successfully delivered.  See Aff. Foreign Mailing [Docket Entry 12].  Then, on February

28, 2011, RDP provided the Clerk of Court with a certificate of service of the Chief Process

Server of Asker and Baerum, Norway, attesting that RDP had, in fact, effected service of process

upon Cambi on January 27, 2011, in Asker, Norway.  See Aff. Service [Docket Entry 13].

Now before the Court is Cambi's motion to dismiss on the ground that RDP failed to

effect sufficient service of process and that RDP's claims are not ripe for adjudication.  Cambi

also belatedly argues that this case should be dismissed for lack of subject-matter jurisdiction because RDP has failed to satisfy the amount in controversy requirement. See Def.'s Reply Mem. of Law in Supp. of Mot. to Dismiss Comp. or to Compel Arbitration ("Def.'s Reply") [Docket Entry 11] at 4-5. Finally, Cambi moves to compel arbitration pursuant to the arbitration provision contained in the proposed agency agreement that it sent to RDP and RDP signed, but that Cambi itself never countersigned.

## STANDARD OF REVIEW

"[T]he proper approach to employ in reviewing the defendant's motion to dismiss and compel arbitration is to apply the same standard of review that governs [Federal Rules of Civil Procedure] Rule 56 motions." Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 67 (D.D.C. 2003). Hence, it is appropriate to grant a party's motion to compel arbitration when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking to compel arbitration bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "'The district court, when considering a motion

to compel arbitration which is opposed on the ground that no agreement to arbitrate has been made between the parties, should give the opposing party the benefit of all reasonable doubts and inferences that may arise . . . . [I]n as much as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate,' consideration of the motion according to the 'standard used by district courts in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c) . . . is appropriate.'" Brown, 267 F. Supp. 2d at 66-67 (quoting Par-Knit Mills v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980)); see also Smith Wilson Co. v. Trading & Dev. Establishment, 744 F. Supp. 14, 16 (D.D.C. 1990).

## DISCUSSION

### I.    Insufficient Service of Process

Cambi first moves to dismiss RDP's complaint on grounds of insufficient service of process pursuant to Fed. R. Civ. P. 12(b)(5). See Def.'s Mot. at 3. Proper service of process "is not some mindless technicality." Friedman v. Estate of Presser, 929 F.2d 1151, 1156 (6th Cir. 1991) (quoting Del Raine v. Carlson, 826 F.2d 698, 704 (7th Cir. 1987)). Rather, the requirement stems from the Due Process Clause of the Fifth Amendment, which mandates that defendants receive adequate notice of proceedings against them. See Dusenbery v. United States, 534 U.S. 161, 167 (2002). Valid service of process is necessary in order for a court to assert personal jurisdiction over a defendant. Cambridge Holdings Grp. v. Fed. Ins. Co., 489 F.3d 1356, 1361 (D.C. Cir. 2007) ("explaining that "unless the procedural requirements of effective service of process have been satisfied, the court lacks personal jurisdiction to act").

To satisfy constitutional requirements, notice must be "reasonably calculated, under all

the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mulane v. Cent. Handover Bank & Trust Co., 339 U.S. 306, 314 (1950). Although actual receipt of notice is not necessary for service to be proper, Dusenbery, 534 U.S. at 171, it is constitutionally sufficient, United Student Aid Funds v. Espinosa, 130 S. Ct. 1367, 1378 (2010).

Under Rule 4 of the Federal Rules of Civil Procedure, service on a corporation -- either domestic or foreign -- may be accomplished in a judicial district of the United States "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). Outside the United States, service on a corporation may also be accomplished in accordance with the Hague Convention. Id. 4(h)(2), 4(f)(1).

Where the propriety of service is challenged, "the party on whose behalf service is made has the burden of establishing its validity." Light v. Wolf, 816 F.2d 746, 751 (D.C. Cir. 1987); Norlock v. City of Garland, 768 F.2d 654, 656 (D.C. Cir. 1985) ("Once the validity of service of process has been contested, the plaintiff 'must bear the burden of establishing its validity.'") (quoting Aetna Bus. Credit v. Universal Decor, 635 F.3d 434, 435 (5th Cir. 1981)). Here, then, RDP has the burden of establishing effective service of process on Cambi.

RDP twice attempted to serve Cambi. First, on November 18, 2010, it left the summons and complaint at the home of Keith Hamilton, whom RDP believed to be Cambi's authorized agent. See Aff. Service. Then, in response to Cambi's motion to dismiss on grounds of improper service of process, RDP again attempted to serve Cambi, this time by mailing a copy of the summons and complaint to the Norwegian Central Authority in accordance with the procedures

set forth in the Hague Convention.  <u>See</u> RDP's Resp. to Cambi's Mot. to Dismiss or Compel Arbitration ("Pl. Opp'n") [Docket Entry 8] at 14-15; RDP's Suggestion of Mootness [Docket Entry 14].  RDP has submitted a certificate of service bearing the seal of the district court of Asker and Baerum, Norway, which attests that RDP successfully served Cambi on January 27, 2011, in Asker, Norway.  <u>See</u> Aff. Service [Docket Entry 13].  This occurred seventy-three days after RDP filed its complaint -- which is well-within Rule 4(m)'s 120-day window for service of process.  <u>See</u> Fed. R. Civ. P. (4)(m).  Because RDP effected proper service of process on Cambi within 120 days of filing its complaint, RDP has now satisfied the requirements of the federal rules (as well as constitutional notification requirements), irrespective of whether RDP's first attempt at service on Hamilton complied with Rule 4(h)(1)(B).  Accordingly, Cambi's motion to dismiss for insufficient service of process will be denied.

## II.    <u>Ripeness</u>

Cambi also moves to dismiss the complaint for lack of subject-matter jurisdiction, alleging that RDP's claims are not ripe.  <u>See</u> Def.'s Mot. at 9.  "Ripeness is a justiciability doctrine . . . drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ."  <u>Nat'l Park Hospitality Ass'n v. Dep't of the Interior</u>, 538 U.S. 803, 807-08 (2003) (internal citations and quotation marks omitted).  A claim is considered "not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  <u>Texas v. United States</u>, 523 U.S. 526, 300 (1998) (citations omitted).  In other words, "if a plaintiff's claim . . . depends on future events that may never come to pass, or that may not occur in the form forecasted, then the claim is unripe."  <u>Devia v. Nuclear Regulatory Comm'n</u>, 492 F.3d 421, 435 (D.C. Cir. 2007) (quoting

McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 72 (1st Cir. 2003)).

The ripeness doctrine primarily exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies . . . ." Abbott Labs. v. Gardner, 387 U.S. 136, 139 (1967). For this reason, courts generally consider ripeness challenges in the context of parties seeking pre-enforcement review of administrative decisions or regulations. Indeed, all but one of the cases that Cambi cites in support of its ripeness argument involve such pre-enforcement challenges to statutes or agency regulations. See, e.g., Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 728 (1998) (determining whether Sierra Club's challenge to Forest Service's land management plan was ripe); Texas, 523 U.S. at 297 (determining whether Texas's claim for a declaratory judgment that the preclearance provisions of the Voting Rights Act did not apply to certain state regulations was ripe); Abbott Labs., 387 U.S. at 148 (determining whether plaintiffs' challenge to FDA regulations was ripe).

Here, however, Cambi seeks to have this Court apply the ripeness doctrine to RDP's common law restitution and contract claims. Specifically, Cambi contends that RDP's common law claims are not ripe for adjudication because Cambi and DCWASA have not yet finalized their contract and DCWASA has not yet installed Cambi's technology at its Blue Plains treatment plant. Def.'s Mot. at 6-7. RDP concedes that Cambi and DCWASA have "not finalized all the contracts necessary for the upgrade to [the] Blue Plains wastewater treatment plant," Compl. ¶ 29, but maintains that its restitution and contract claims do not depend on this future event. Rather, RDP alleges that it has already expended resources on Cambi's behalf, id. ¶¶ 21-25, 69, 80, that Cambi has benefitted from RDP's work, id. ¶ 26-28, 72-73, 81, that

DCWASA has made some payments to Cambi, id. ¶ 29, that Cambi owes RDP a five percent

commission on any amount that DCWASA has paid or will pay Cambi in the future, id. ¶ 64,

and that Cambi has refused to make any such payments, id. ¶ 62.

These allegations are sufficient to create a justiciable "case or controversy" currently ripe

for review.  Unlike pre-enforcement challenges to administrative regulations, claims for breach

of contract "cannot be described as premature since they speak of damages that have already

been suffered and are being suffered."  Casanova v. Marathon Corp., 256 F.R.D. 11, 15 (D.D.C.

2009).  In the single case that Cambi cites where a court dismissed a common law contract claim

as unripe, pension plan participants sought a declaratory judgment stating the extent of a

company's liability in the event of a breach of contract.  Systems Council EM-3 v. AT&T Corp.,

159 F.3d 1376, 1382-83 (D.C. Cir. 1998).  Here, however, RDP does more than seek a

declaratory judgment as to its rights vis-à-vis Cambi's arrangement with DCWASA.  RDP also

seeks damages for work it performed that allegedly benefitted Cambi, and for a breach of

contract that has allegedly already occurred.  As alleged by RDP, the contract dispute between

Cambi and RDP is thus "not an abstract or hypothetical disagreement"; rather, it is a "typical

contract dispute under which the parties' interests are clearly adverse."  See, e.g., Principal Life

Ins. Co. v. Robinson, 394 F.3d 665, 671-72 (9th Cir. 2005) (explaining why a contract dispute

was ripe).  And at this stage of the proceedings -- on Cambi's motion to dismiss -- those

allegations must be accepted by the Court.  For these reasons, the Court concludes that RDP's

restitution and contract claims are ripe.

With respect to RDP's request for a declaratory judgment that Cambi owes it five percent

of all monies received from DCWASA, see Compl. ¶¶ 98-100, the ripeness assessment is

somewhat more complex. The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration," 28 U.S.C. § 2201(a), although it "is not an independent source of federal subject matter jurisdiction," Schilling v. Rogers, 366 U.S. 666, 677 (1960). The Seventh Circuit has explained that the ripeness inquiry is "more complicated" when assessing claims for declaratory relief, but such claims still must present an actual controversy in order to justify judicial involvement. See Wis. Cent., Ltd., v. Shannon, 539 F.3d 751, 759 (7th Cir. 2008) (explaining that the ability to bring suit under the Declaratory Judgment Act "does not vitiate the constitutional requirement that the claim address 'a case of actual controversy'" (internal citation omitted)). In assessing whether a declaratory judgment action is ripe, courts must determine "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" MedImmune, Inc. v. Genetech, Inc., 549 U.S. 118, 127 (2007) (quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)).

Here, the dispute between RDP and Cambi is "definite and concrete," and it calls for "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." MedImmune, 549 U.S. at 127 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41 (1937)). RDP alleges that Cambi has flatly repudiated its contractual obligations by refusing to pay RDP any commission on money that Cambi has already received and will continue to receive from DCWASA. See Compl. ¶ 63. Accepting plaintiff's allegations in the complaint as true, which again the Court must do in assessing a motion to dismiss, Cambi has received funds from DCWASA and RDP is

entitled to five percent of these funds.  Id. ¶¶ 29, 64.  Contrary to Cambi's assertion, then, see Def.'s Mot. at 7, "delayed review would cause hardship" to RDP, since RDP is already being denied funds to which it is contractually entitled, see Ohio Forestry Ass'n,, 523 U.S. at 733 (explaining that in deciding whether a case is ripe for judicial review, the court must consider whether withholding judicial consideration will cause hardship to the parties).  The Court thus finds that RDP's claim is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  Hence, RDP's claim for declaratory relief is now ripe.

**III.     Amount in Controversy**

In its Reply, Cambi also asserts -- for the first time -- that RDP does not allege sufficient facts to satisfy the amount in controversy requirement for diversity jurisdiction.  See Def.'s Reply at 4; 28 U.S.C. § 1332(a) (stating that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs").  In determining whether a plaintiff has met the amount in controversy requirement, federal courts will only dismiss a case where it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount."  St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938).  In other words, courts must "be very confident that a party cannot recover the jurisdictional amount before dismissing the case for want of jurisdiction."  Rosenboro v. Kim, 994 F.2d 13, 17 (D.C. Cir. 1993).  In general, "[a] plaintiff's allegation that the matter in controversy exceeds the jurisdictional amount requirement, even when it is in cursory form," is sufficient to evade dismissal.  14AA Charles Alan Wright et al., Federal Practice & Procedure § 3702 (4th ed.); see also Rosenboro, 994 F.2d at 17 ("[T]he Supreme Court's yardstick demands that courts be very confident that a party cannot recovery the

jurisdictional amount before dismissing the case for want of jurisdiction."); Martin v. Gibson, 723 F.2d 989, 991, 993 (D.C. Cir. 1983) (characterizing the St. Paul Mercury test as "exacting" and "stringent"); Saiyed v. Council on Am.-Islamic Relations Network, Inc., 742 F. Supp. 2d 84, 89 (D.D.C. 2010) (finding that the jurisdictional amount in controversy was satisfied even though the court had "serious doubts as to whether plaintiff will ever be able to prove damages of more than $75,000").

Here, RDP alleges that the amount in controversy exceeds $75,000, exclusive of interest and costs. Compl. ¶ 5. And this would certainly seem to be the case. Construing the complaint in the light most favorable to RDP, Cambi has breached a contract worth an estimated $3 million, given that RDP is allegedly entitled to five percent of the proceeds on Cambi's $60 million contract with DCWASA. See Compl. ¶ 66. Cambi, thus far, does not contest the amount of money that RDP would eventually be owed if the contract between Cambi and DCWASA was finalized. Rather, Cambi argues only that RDP has not yet sustained $75,000 in damages because "Cambi has received nothing from DCWASA." Def. Reply at 4. Significantly, however, RDP alleges that Cambi has already received money from DCWASA and that Cambi has refused to pay a commission on any money it will receive from DCWASA.[1] See Compl. ¶¶ 29, 63. RDP need not show that it has sustained $75,000 in damages; rather it is sufficient for jurisdictional purposes for RDP to demonstrate what it "hopes to get out of the litigation," see Rising-Moore v. Red Roof Inns, Inc., 435 F.3d 813, 816 (7th Cir. 2006) -- or, in other words,

---

[1] In assessing the value of RDP's claims, the Court may properly consider "the prospect of future payments" to RDP. See Hiss v. Hampton, 338 F. Supp. 1141, 1146 (D.D.C. 1972); see also Aetna Cas. & Sur. Co. v. Flowers, 330 U.S. 464, 468 (1947) ("[T]he fact that it cannot be known as a matter of absolute certainty that the amount which may ultimately be paid . . . will exceed [$75,000]" does not mean that jurisdiction is lacking.).

what it "stands to recover," see Meridian Sec. Ins. Co. v. Sadowski, 441 F.3d 536, 541 (7th Cir. 2006); see also McPhail v. Deere & Co., 529 F.3d 947, 956 (10th Cir. 2008) (explaining that parties need only "affirmatively establish jurisdiction by proving jurisdictional *facts* that ma[k]e it *possible* that $75,000 was in play" (emphasis in original)).  Accordingly, at this time the Court will deny Cambi's motion to dismiss for failure to meet the jurisdictional amount in controversy.

## IV.     Motion to Compel Arbitration

### A.     The Proper Forum

Cambi further moves to compel arbitration in accordance with the arbitration and forum selection clause contained in the proposed agency agreement that it sent to RDP and that RDP signed.  See Def.'s Mot. at 12.  "[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985).  "[A]rbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Commc'n Workers of Am., 475 U.S. 643, 648 (1986) (internal quotation marks omitted).  Hence, the initial question is whether RDP and Cambi intended to arbitrate the present dispute.  This question, in turn, depends on the threshold issue of whether the proposed agency agreement that RDP signed, which contained an arbitration provision, was in fact a valid, binding contract between the parties.

Cambi recognizes that a decision as to the validity[2] of its agency agreement with RDP is

---

[2]  Although Cambi does not define the term "validity," see Def. Mot. at 8-9, the Court will use the term for purposes of this decision to encompass challenges to the legitimacy of a contract on the ground that it was not properly formed and hence does not exist.  Nonetheless, the Court recognizes that the Supreme Court has, in some instances, confined the term validity to refer only to questions of contractual defenses.  See, e.g., Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2778 n.2 (2010) (explaining that "[t]he issue of the agreement's 'validity' is different

essential to this case, but maintains that even the threshold question of the validity of its contract with RDP is for a Norwegian arbitrator to decide.  See Def.'s Mot. at 12.  Cambi is incorrect.  "It is . . . well settled that where the dispute at issue concerns contract formation, the dispute is generally for <u>courts</u> to decide."  <u>Granite Rock Co. v. Int'l Bhd. of Teamsters</u>, 130 S. Ct. 2847, 2855-56 (2010) (emphasis added); <u>accord</u> <u>Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.</u>, 850 F.2d 756, 761 (D.C. Cir. 1988) ("[I]ssues of formation . . . must always be decided by the courts . . . .").  Cambi emphasizes the agency agreement's express statement that "[a]ny dispute . . . arising out of or in connection with . . . [the] invalidity [of this agreement] . . . shall be settled by arbitration."  But, of course, this clause is without force and effect if the parties never agreed to it in the first place.  <u>See</u> <u>Nat'l RR. Passenger Corp.</u>, 850 F.2d at 761.  That is to say, "if there was never an agreement to arbitrate, there is no authority to require a party to submit to arbitration."  <u>Id.</u>[3]

The Supreme Court has distinguished challenges to the validity of a contract on grounds related to its formation from challenges to the validity of a contract on grounds that it is void and revocable.  <u>See</u> <u>Buckeye Check Cashing, Inc. v. Cardenga</u>, 546 U.S. 440 (2006).  While the former category concerns nonarbitral questions about whether an arbitration agreement was

_____

from the issue whether any agreement between the parties 'was ever concluded.'").
[3]  In support of its contention that a Norwegian arbitrator should decide whether the agency agreement is valid, Cambi relies almost entirely on a statement in an opinion from the District of Columbia Court of Appeals, in which the court notes that "an arbitrator 'shall decide . . . whether a contract containing a valid agreement to arbitrate is enforceable.'"  <u>See</u> Def.'s Mot. at 8 (quoting <u>Menna v. Plymouth Rock Assur. Corp.</u>, 987 A.2d 458, 465 (D.C. 2010) (quoting the Revised Uniform Arbitration Act ("RUAA")).  In the same sentence, however, the <u>Menna</u> court explains that under the RUAA, the threshold issue of "whether an agreement to arbitrate exists" shall be decided by the court, not the arbitrator.  <u>See</u> <u>Menna</u>, 987 A.2d at 465 (quoting the RUAA as stating that "'[t]he court shall decide whether an agreement to arbitrate exists'").  To the extent that <u>Menna</u> and its interpretation of the RUAA is even relevant in this federal action, then, it undermines rather than substantiates Cambi's argument.

-15-

"ever concluded," id. at 444 n.1, the latter category encompasses questions about the revocation of contracts because of illegality, see id. at 444, such as for fraud, duress, unconscionability or mutual mistake, which may be the subject of arbitration. In Buckeye, parties resisting arbitration argued that a usurious interest provision in a loan agreement voided the entire agreement, including the arbitration clause. See id. at 443. The Court considered only "whether a court or an arbitrator should consider the claim that a contract containing an arbitration provision is void for illegality." Id. at 442 (emphasis added). The Court's pronouncement in Buckeye that "a challenge to the validity of the contract as a whole . . . must go to the arbitrator" therefore excluded questions about validity arising from contract formation. See id. at 444 n.1, 449.

When the Supreme Court revisited its framework for deciding the circumstances under which arbitration disputes require judicial resolution, it confirmed that the question whether the parties ever successfully formed a contract in the first place is one for courts to decide. See Granite Rock, 130 S. Ct. at 2855-56; accord Toledano v. O'Connor, 501 F. Supp. 127, 140 (D.D.C. 2007) (noting that Buckeye does not encompass disputes over whether a contract exists at all); see also Amirmotazedi v. Viacom, Inc., 768 F. Supp. 2d 256, 262-63 (D.D.C. 2011) (finding that the question whether a party had the requisite mental capacity to form an arbitration agreement is not controlled by Buckeye and is for the court, not an arbitrator, to decide). The Court was clear that "[t]o satisfy itself that [an] agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." Granite Rock, 130 S. Ct. at 2856. In rejecting the proposition that the federal policy favoring arbitration permits an arbitrator to decide when a labor union ratified a contract, the Court emphasized that "courts should order arbitration of a

dispute <u>only</u> where the court is satisfied that the formation of the parties' arbitration agreement . . . is [not] in issue." <u>Id.</u> at 2857 (emphasis added).

Unlike other circuits, the D.C. Circuit has never had occasion to consider the propriety of district-court adjudication of challenges to the formation of a contract containing an arbitration provision (as opposed to challenges to the formation of the arbitration provision itself). This Circuit has, however, long treated "disputes over the formation of an agreement to arbitrate -- i.e., whether the parties ever agreed to submit anything to arbitration in the first place" -- as properly for the courts to decide. <u>Nat'l R.R Passenger Corp.</u>, 850 F.2d at 761; <u>see also</u> <u>Bailey v. Fed. Nat'l Mortg. Ass'n</u>, 209 F.3d 740, 746-47 (D.C. Cir. 2000) (finding no mutual assent to arbitration policy). Furthermore, the D.C. Circuit in <u>Nat'l R.R. Passenger Corp.</u> cited with approval cases from other circuits that assessed the existence of the underlying contract as a whole. <u>See</u> 850 F.2d at 761 (citing <u>A.T. Massey Coal Co. v. Int'l Union, United Mine Workers of Am.</u>, 799 F.2d 142 (4th Cir. 1986); <u>Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.</u>, 636 F.2d 51 (3d Cir. 1980)). Those circuits, in turn, relied upon the established proposition that "arbitration is a matter of contract and a party cannot be required to submit to arbitrate any dispute which he has not agreed so to submit." <u>AT&T Techs.</u>, 475 U.S. at 648 (internal quotation omitted); <u>see</u> <u>A.T. Massey Coal Co.</u>, 799 F.2d at 146; <u>Par-Knit Mills</u>, 636 F.2d at 54; <u>see also</u> <u>Air Line Pilots Ass'n v. Fed. Express Corp.</u>, 402 F.3d 1245, 1248 (D.C. Cir. 2005). Hence, a party that contests its assent to a contract containing an arbitration provision should not be required to submit to arbitration until the court determines that an agreement in fact existed. <u>See, e.g.</u>, <u>Sphere Drake Ins. Ltd. v. All Am. Ins. Co.</u>, 256 F.3d 587, 591 (7th Cir. 2001) ("[A]s arbitration depends on a valid contract[,] an argument that the contract does not exist can't

logically be resolved by the arbitrator…."); Par-Knit Mills, Inc., 636 F.2d at 55 ("A party may, in an effort to avoid arbitration contend that it did not intend to enter into the agreement which contained an arbitration clause.").  Accordingly, this Court is the appropriate forum to determine whether RDP and Cambi ever formed a written contract containing an arbitration provision.

B.    Existence of an Agreement

The present dispute between RDP and Cambi "is not a case in which the parties disagree over the meaning of an existing agreement.  Rather, the legal battle is over the *existence* of a contract, not its meaning."  Bailey v. Fed. Nat'l Mortg. Ass'n, 209 F.3d 740, 744 (D.C. Cir. 2000).  The Court must apply "ordinary state-law principles that govern the formation of contracts" to determine whether the parties ever formed a binding contract containing an arbitration provision.  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); Aliron Int'l, Inc. v. Cherokee Nation Indus., 531 F.3d 863, 865 (D.C. Cir. 2008).  "The determination whether an enforceable contract exists, when based on the contract documents, is a question of law."  Kramer Assocs. v. Ikam, Ltd., 888 A.2d 247, 251 (D.C. 2005) (quoting Rosenthal v. Nat'l Produce Co., 573 A.2d 365, 369 n.9 (D.C. 1990)); see also Strauss v. NewMarket Global Consulting Group, 5 A.3d 1027, 1032 (D.C. 2010) (as applied to oral contracts).  Moreover, the party seeking to enforce the contract bears the burden of proving its existence.  Bailey, 209 F.3d at 746; Kramer Assocs., 888 A.2d at 251 (citing Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995)).  This burden extends to the issue of contract formation.  Novecon Ltd. v. Bulgarian-American Enter. Fund, 190 F.3d 556, 564 (D.C. Cir. 1999).  Because Cambi has moved to compel arbitration pursuant to the proposed agency agreement that RDP signed, Cambi bears the burden of proving that the agreement constitutes a valid contract under

District of Columbia law.[4]

Under District of Columbia law, "[f]or an enforceable contract to exist, there must be both (1) agreement as to all material terms, and (2) intention of the parties to be bound." Kramer Assocs., 888 A.2d at 252 (citing Georgetown Entm't Corp. v. Dist. of Columbia, 496 A.2d 587, 590 (D.C. 1985)); accord Bailey, 209 F.3d at 746. Where there is no meeting of the minds between the parties, there is no contract to enforce. See Bailey, 209 F.3d at 741. The Court must look closely at the parties' intentions to determine whether there has been a meeting of the minds, and hence whether a contract exists. See Jack Baker, 664 A.2d at 1239. "[B]oth parties must have the distinct intention to be bound; without such intent, there can be no assent and therefore no contract." Id.

A meeting of the minds "takes the form of an offer or proposal by one party followed by an acceptance by the other party." Restatement (Second) of Contracts § 22 (1981); see also Northland Capital Corp. v. Silver, 735 F.2d 1421, 1428 n.10 (D.C. Cir. 1984) ("To have mutual assent . . . one party must have accepted by word or deed an offer from the other."). An offer is a manifestation of intent to be bound without further action on the part of the offeror. 1836 S St. Tenants Ass'n v. Estate of B. Battle, 965 A.2d 832, 839 (D.C. 2009) (citing Restatement (Second) of Contracts § 24 (1981)); see also Toledano, 501 F. Supp. 2d at 141. Once an offer is made, the offeree possesses the power of acceptance and can bring the contract into existence by accepting the offer. 1836 S St., 965 A.2d at 839 ("[A]n offer is, by definition, binding on the

---

[4] Cambi expressly refrains from arguing that the proposed agency agreement is a valid contract. See, e.g., Def.'s Mot. at 13 (stating only "[i]f the RDP Agreement is valid . . .") (emphasis added). And with good reason. In its current motion to compel arbitration, Cambi seeks to rely on the arbitration clause contained in its proposed agency agreement with RDP, but presumably, if this case were to proceed to the merits before a Norwegian arbitrator, Cambi would then argue that it never entered into a valid contractual relationship with RDP.

offeror if it is properly accepted by the offeree."); Restatement (Second) of Contracts § 24 cmt. a (1981) (noting that "the key concept involves giving the addressee the apparent power to conclude a contract without further action by the other party").  In order for an offer to be valid, it "must contain all of the material terms of the bargain."  1836 S St., 964 A.2d at 839.

Contract formation commonly involves the use of unsigned documents that are not operative offers but merely steps in the preliminary negotiation of agreements.  See Restatement (Second) of Contracts § 26 cmt. e (1981).  Such documents -- even if they constitute a "manifestation of willingness to enter into a bargain" -- do not constitute a formal "offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."  Restatement (Second) of Contracts § 26 (1981).  A court may consider all the surrounding circumstances to determine whether a particular document constitutes an operative offer or an inoperative communication made during preliminary negotiations.  See, e.g., Toledano, 501 F. Supp. 2d at 141 (applying California law).  In the District of Columbia, "parties will not be bound to a preliminary agreement unless the evidence presented clearly indicates that they intended to be bound at that point."  Jack Baker, 664 A.2d at 1239 (emphasis added).

Hence, the D.C. Court of Appeals has held that a letter outlining the terms of an agreement between two parties was not a binding contract, because the parties had contemplated a later writing memorializing their agreement.  See Simplicio v. Nat'l Scientific Pers. Bureau, Inc., 180 A.2d 500, 502 (D.C. 1962).  Other courts have similarly concluded that preliminary documents exchanged between the parties do not constitute operative offers where the parties intended to have further communications before reaching a final agreement.  See, e.g., Sumerel

v. Goodyear Tire & Rubber Co., 232 P.3d 128, 132-134 (Colo. App. 2009) (holding that there was no offer capable of acceptance when the parties contemplated further discussion); Intermountain Forest Mgmt., Inc. v. La. Pac. Corp., 31 P.3d 921, 925-26 (Id. 2001) (no operative offer when parties had reason to know that further manifestation of assent was necessary).

Here, RDP alleges that in December 2008, Cambi e-mailed RDP a proposed agency agreement in order to memorialize a prior oral agreement. Compl. ¶ 40. In early May 2009, RDP president Richard Christy and Cambi representative Harald Kleiven allegedly discussed the written proposed agency agreement at a trade conference in Oregon. Id. ¶ 44. RDP alleges that Christy raised several questions and concerns about the agreement at that time. Id. ¶ 45. In response, Kleiven indicated that all of the issues RDP raised were "open to discussion." Id. ¶ 46. Then, on May 8, 2009, Christy signed the proposed agency agreement and returned it to Cambi, which refused to countersign. Id. ¶¶ 47, 51. Finally, on September 23, 2009, Cambi notified RDP that it was withdrawing the proposed agreement. Id. ¶ 57-58. Accordingly, the Court must determine whether the proposed agency agreement that Cambi sent RDP and that Christy signed and returned constituted a contractual offer capable of acceptance by RDP under D.C. law.

As previously explained, an offer is a manifestation of an intent to be bound without further action on the part of the offeror. But here, the surrounding circumstances contain several indications that Cambi's proposed agency agreement was not intended to be final, and did not constitute an operative offer capable of acceptance by RDP. See, e.g., Novecon, 190 F.3d at 564-65 (examining indications of non-finality to determine that preliminary documents in negotiations did not constitute a binding agreement).

First, RDP and Cambi both describe the document that Cambi e-mailed as a "propos[al]."

See Compl. ¶ 40; Def.'s Mot. at 6.  Although the agreement itself did not contain the word "proposal" in its title, it did have blank signature lines for both Cambi and RDP, thereby indicating that Cambi contemplated additional action would be necessary on its part before a valid, binding contract could be formed.  See Def.'s Mot., Ex. A.  Second, the interaction between RDP and Cambi at the Oregon conference suggests that each party viewed the December 2008 agreement as a working document, rather than as an operative offer.  As alleged in the complaint, Christy (on behalf of RDP) "raised several questions and concerns regarding the proposed" agreement, and Kleiven (on behalf of Cambi) responded that "those issues were open to discussion."  Compl. ¶¶ 45-46.  That is a preliminary negotiation, not an operative offer and acceptance.  Presumably, if Kleiven had regarded the proposed agency agreement as his company's formal, final offer to RDP, he would have been less amenable to the possibility of revisions being made.  See, e.g., Kramer Assocs., 888 A.2d at 252 (noting that the parties' actions at the time of contracting can indicate whether there was a meeting of the minds).  For these reasons, the Court finds, as a matter of law, that no operative offer existed in May 2009 when Christy signed the proposed agency agreement from Cambi.

Accordingly, a valid contract was never formed between the parties, so the arbitration clause contained in the agency agreement is unenforceable.[5]  The Court will therefore deny the motion to compel arbitration.  And because the Court concludes that the agency agreement does not constitute a valid written contract between RDP and Cambi, RDP is unable to prevail on

---

[5]  Even if RDP's transmission to Cambi of the signed agreement is considered an operative offer made by RDP to Cambi, the Court would reach the same result.  To the extent that Cambi interpreted RDP's May 8, 2009 communication as an offer, Cambi's words and actions indicate that it unequivocally rejected that offer.

Count VI of its complaint for breach of an express contract.[6]  Hence, the Court will dismiss that claim.[7]

## CONCLUSION

For the foregoing reasons, the Court will deny defendant's motion to dismiss and motion to compel arbitration.  It will also dismiss Count VI of the Complaint.  A separate Order accompanies this Memorandum Opinion.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>August 2, 2011</u>

---

[6]  Count VI is for breach of an express contract, and Count III is for breach of an oral contract. Oral contracts can, of course, be express contracts, <u>Am. Prop. Const. Co. v. Sprenger Lang Found.</u>, Civ. A. No. 09-1232, 2011 WL 810092, at *3 n.6 (D.D.C. Mar. 9, 2011) ("There is a broad category of agreements that are unwritten but nevertheless express – namely, oral agreements."), but RDP's Count VI appears to be for breach of the express, written agency agreement.

[7]  The Court offers no opinion as to whether RDP and Cambi ever formed an oral contract and, if they did form such a contract, whether Cambi breached that contract.